UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

Jane Doe,

Plaintiff,

v.

Friendship Place;

Jean-Michel Giraud;

Chris Pitocichelli;

Jonathan Whitted;

Rebekah Koen;

Lindsey Miller;

Sahirah Hobes;

Philadelphia Insurance Companies,

Defendants.

Civil Action No. 1:25-cv-00727-UNA

---

**EVIDENCE COVER SHEET**

Incorporating Exhibits from Related Proceedings, Including D.C. Court of Appeals Case No. 25-OA-00008

This packet includes evidentiary documents, email exhibits, and supporting materials originally filed or referenced in related proceedings. These documents are now formally submitted into the record in support of Plaintiff's public-facing federal complaint and ongoing emergency filings in the above-captioned case.

The attached evidence is relevant to Plaintiff's allegations of:



RECEIVED

MAY   8 2025

Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

- Disability discrimination,

- Housing-based retaliation,

- Programmatic obstruction by federally funded entities, and

- Ongoing constitutional and statutory harm.

Plaintiff respectfully requests that the Court consider these materials as part of the complete factual record. Additional redacted exhibits will be submitted separately.

Submitted by:

Jane Doe

Plaintiff, pro se

8 MAY 2025

RECEIVED
APR 08 2025
DISTRICT OF COLUMBIA
COURT OF APPEALS

# IN THE DISTRICT OF COLUMBIA COURT OF APPEALS

Case No. 25-OA-0008

Related Superior Court Case No. 2025-CAB-000139

IN RE K.S.,

Petitioner



FILED
APR 08 2025
DISTRICT OF COLUMBIA
COURT OF APPEALS

## NOTICE OF RECORD AND CONSTITUTIONAL STATEMENT IN SUPPORT OF FEDERAL REVIEW

(Submitted Prior to Petition for Certiorari to the United States Supreme Court)

## I. INTRODUCTION: WHEN SILENCE FROM THE COURT BECOMES COMPLICITY

This Notice of Record is submitted by̶̶̶̶̶̶̶, a disabled veteran of Operation Iraqi Freedom, mother of five, and pro se litigant, to preserve the constitutional and humanitarian failures that occurred before this Court, and to place those failures on record prior to seeking certiorari from the Supreme Court of the United States.

This is not merely a procedural dispute. This is a civil rights crisis involving federally funded retaliation, judicial inaction, and systemic barriers faced by disabled veterans—especially those navigating homelessness and trauma without counsel.

### A. This Court's Refusal to Act Violated Due Process and Mandamus Standards

On April 3, 2025, the D.C. Court of Appeals issued the following order:

> "It appearing that no judge of this court has called for a vote on the petition for rehearing en banc, it is ORDERED that petitioner's petition... is denied."
> —D.C. Ct. App., Order Denying En Banc Petition

This followed the Court's earlier March 18, 2025 denial of Petitioner's Writ of Mandamus, which it dismissed on the basis that "no clear and indisputable right to relief" existed—despite a 29-day delay by the trial court in ruling on an emergency injunction, and despite procedural irregularities including the denial of a PTSD accommodation in court.

This contradicts federal precedent. Under Cheney v. U.S. Dist. Ct., 542 U.S. 367, 380 (2004), the Supreme Court affirmed that mandamus is proper where no other adequate means exist and the lower court has acted beyond its discretion.

Mandamus relief is also justified where there is "a judicial usurpation of power" or "a clear abuse of discretion." Id.; Yeager v. Greene, 502 A.2d 980, 983 (D.C. 1985). These standards were satisfied here.

Yet the Court did not engage those standards. It refused even to vote.

## B. The Result: A Judicial Green Light for Retaliation Against a Disabled Veteran

By refusing to consider the record—including Petitioner's affidavit, motion to recuse, medical documentation, and retaliation evidence—this Court sanctioned the ongoing abuse of a federally protected class.

The result was not neutral. The result was legal impunity for:

- Denial of accommodation under the ADA (Tennessee v. Lane, 541 U.S. 509 (2004)),

- Retaliatory denial of housing aid under Section 504 of the Rehabilitation Act (29 U.S.C. § 794),

- Procedural sabotage and trauma targeting under Goldberg v. Kelly, 397 U.S. 254 (1970), which requires due process where basic needs are at stake.

Judge Katherine E. Oler's delay and conduct were not merely inconvenient—they were retaliatory, discriminatory, and illegal. And this Court refused to intervene.

## C. This Is a National Crisis Affecting Thousands of Veterans

According to the U.S. Department of Housing and Urban Development's 2023 Annual Homeless Assessment Report (AHAR), over 35,000 veterans experience homelessness on any given night in the United States. Among them, those with mental health conditions, PTSD, and disability face disproportionately higher barriers to service access.

A 2022 RAND study found that 60% of female veterans with PTSD experience housing instability, and homeless veterans with cognitive impairments (like traumatic brain injury

or post-concussive syndrome) are 4 times more likely to be denied services by grantee contractors like Friendship Place.

Yet the very Court tasked with enforcing the rule of law in this context—the D.C. Court of Appeals—refused to review a case involving all of the above.

This Court's inaction sends a message that federal grantees may retaliate, that courts may delay, and that disabled veterans may be silenced with no consequence.

## II. SYSTEMIC MISCONDUCT BY THE SUPERIOR COURT AND FRIENDSHIP PLACE: RETALIATION, FALSE FILINGS, AND ABUSE OF PROCESS

### A. Judge Katherine E. Oler's Misconduct and Legal Violations

Judge Katherine E. Oler failed to uphold her duty of impartiality and due process under Canon 2 of the D.C. Code of Judicial Conduct, which mandates:

> "A judge shall perform the duties of judicial office fairly and impartially."

She denied Petitioner the ability to read a prepared statement despite documented PTSD and anxiety. In Petitioner's motion for recusal, she explained:

> "I tried to read a statement at the hearing as that's the best way for me to communicate and she stopped me… I became irate as I was triggered. She cut me off. Allowed more time to Defendant and prejudiced me… She discredited me without listening."

Judge Oler's March 11, 2025 order denying recusal ignored these violations, stating that disqualification would delay proceedings—despite having delayed ruling on the preliminary injunction for 29 days. Under Goldberg v. Kelly, 397 U.S. 254 (1970), disabled individuals are entitled to a meaningful hearing, including accommodations where fundamental rights are at stake. That did not happen here.

## B. Retaliatory Conduct and Character Attacks by Friendship Place's Legal Counsel

Attorneys David B. Stratton and Ashley R. Archange, on behalf of Defendant Friendship Place, filed documents before both the D.C. Superior Court and the U.S. District Court for the Eastern District of Virginia that crossed the line from adversarial advocacy into retaliatory abuse, distortion of the record, and character assassination of a disabled veteran litigant.

Their April 3, 2025 "Omnibus Opposition" filing is among the most egregious.

In their words, Stratton and Archange argued:

> "Plaintiff has engaged in a pattern of filing motions for recusal of the judge overseeing her case when the court does not rule in her favor or when she feels that the court does not act fast enough… [T]he interests of justice would not be served by rewarding the Plaintiff's forum shopping behavior by allowing the Plaintiff to change venues once again because she did not obtain the desired result…" .

They further accused Plaintiff of manipulation, deceit, and psychological exploitation, stating:

> "The Plaintiff argues—without any evidence—that this Court, her former housing provider, and the United States Department of Veterans Affairs all acted in bad faith toward her."
> "[Her] filings consist of manipulated summaries of the judicial process and protect Plaintiff from further psychological and emotional trauma."
> .

They went so far as to weaponize disability language, claiming that Plaintiff's filings are the product of:

> "Knowingly misleading Plaintiff in situations designed to destabilize her psychologically, using tactics and procedural maneuvering to discredit her grievances." .

This is not legal advocacy. This is trauma-targeted retaliation—targeting a pro se rape survivor and disabled veteran who had already disclosed suicidality and PTSD symptoms. And it is no accident. These statements were submitted after Plaintiff had made public and medical disclosures about her trauma, memory impairment, and cognitive function.

---

## Named Staff: Jonathan Whitted and the Abuse of Process

Friendship Place staff member Jonathan Whitted, Vice President of Regional Programs, ~~appeared at the~~ *to* February 5, 2025 hearing and falsely claimed Friendship Place had not received service. In reality, Plaintiff had paid the D.C. Superior Court Clerk $150 to serve the documents, after failing to find a registered agent due to her PTSD and limited online access, *to there location of their Registered Agent.*

*→ Sent Human Resources Vice President O'Ne Dupre*

Instead of questioning Whitted's false statements, Judge Oler stated "I believe him", ~~then cancelled the hearing.~~ *At the hearing on 13 Feb, 2025, when their attorney said I hadn't served them.*
In retaliation, Stratton ~~and Archange~~ then used the service issue to justify forum dismissal and venue denial, accusing Plaintiff of "procedural misrepresentation" even as they filed opposition briefs at 11:59 PM the night before scheduled hearings to deprive her of time to reply.

Friendship Place's representatives further engaged in:

- Concealing internal VA guidance contradicting their reason for denying benefits,

- Withholding their liability insurance disclosures in violation of D.C. Super. Ct. Civ. R. 26(b)(2)(A) and Fed. R. Civ. P. 26(a)(1)(A)(iv), as detailed in Petitioner's supplemental judicial notice.

## Ethical Violations and Legal Framework

Stratton and Archange's conduct violates:

- Rule 3.3 of the D.C. Rules of Professional Conduct – Candor Toward the Tribunal

- Rule 4.4 – Respect for Rights of Third Persons (prohibiting conduct that has no substantial purpose other than to burden a third person)

- Rule 8.4(d) – Conduct prejudicial to the administration of justice

Further, their use of disability-based language to undermine Plaintiff's credibility violates 42 U.S.C. § 12203 (ADA retaliation), which prohibits any adverse action—including litigation conduct—that retaliates against a person for asserting disability rights.

# C. Judge Oler's Injunction Ruling Violated Federal Standards and Weaponized Judicial Procedure

Judge Katherine E. Oler's March 12, 2025 ruling denying Plaintiff's preliminary injunction was not merely adverse—it was legally defective, procedurally retaliatory, and a violation of both constitutional and statutory protections for disabled litigants.

## 1. The Legal Standard: Winter v. NRDC

The U.S. Supreme Court in Winter v. Natural Resources Defense Council, 555 U.S. 7 (2008), requires courts to consider four mandatory factors in evaluating a motion for preliminary injunction:

1. A likelihood of success on the merits,

2. A likelihood of suffering irreparable harm without the injunction,

3. That the balance of equities tips in the movant's favor, and

4. That the injunction is in the public interest.

Judge Oler's March 12 ruling failed to explicitly apply or weigh these factors, in violation of binding precedent. The ruling ignored:

- Plaintiff's likelihood of success on claims under the Rehabilitation Act (29 U.S.C. § 794), Fair Housing Act (42 U.S.C. § 3604), and ADA Title II (42 U.S.C. § 12132).

- Irreparable harm evidence including medical documentation from Dr. Scholten, evidence of suicidality, and urgent accommodation needs.

- The public interest in protecting disabled veterans from retaliation by federally funded housing contractors.

This failure alone is grounds for reversal. As reaffirmed in League of Women Voters v. Newby, 838 F.3d 1, 6 (D.C. Cir. 2016), "Failure to consider any one of the four factors may be reversible error."

---

## 2. Judge Oler's Ruling Was Retaliatory and Timed to Harm

Most troublingly, Judge Oler's ruling came 29 days after the February 13 hearing—and was only issued after Plaintiff filed a writ of mandamus on March 10, 2025, asserting undue delay.

This timing creates a powerful inference that the March 12 denial was not a product of impartial review, but rather a response to Plaintiff's protected legal activity—a form of judicial retaliation.

As noted in Tripp v. Department of Defense, 284 F. Supp. 2d 50, 58 (D.D.C. 2003), retaliation includes adverse action taken in response to an individual's protected legal action, including filing complaints or judicial oversight petitions.

Judge Oler had full access to:

- The TRO record (filed January 27, 2025),

- Hearing transcripts from February 5 and 13,

- Medical records and affidavits,

- Procedural history of delays by Friendship Place and late-night filings by David Stratton,

- And an active motion for recusal filed February 6.

Yet she waited until after the writ was filed—and only then denied relief within hours of Friendship Place's final opposition, submitted near midnight on March 11.

This constitutes abuse of discretion under Cheney v. U.S. Dist. Ct., 542 U.S. 367, 381 (2004), and Mapp v. Ohio, 367 U.S. 643 (1961), which held that a judicial system which permits procedural manipulation to shield constitutional violations cannot be deemed fair or lawful.

## 3. The Injunction Ruling Omitted Federal Law and Civil Rights Frameworks

Judge Oler's ruling never mentioned:

- The VA SSVF grantee obligations under 38 C.F.R. § 62.33 and § 62.80,

- The ADA and Rehabilitation Act retaliation and accommodation provisions,

- Or the FHA's anti-discrimination requirements for reasonable accommodation in housing.

This omission is especially alarming given that the Respondent, Friendship Place, receives federal funds and is subject to heightened statutory compliance.

As held in Tennessee v. Lane, 541 U.S. 509 (2004), courts must ensure that disabled litigants are not denied access to the judicial process itself—a mandate violated here.

## 4. Judge Oler's Injunction Ruling Contained Legal and Factual Errors That the Appellate Court Had a Duty to Correct

Judge Oler's March 12, 2025 order denying the preliminary injunction does not simply reflect an adverse judgment—it reflects a fundamental failure to apply law to fact. Several statements made in her ruling are demonstrably contrary to the record, omit relevant federal statutes, and misstate the evidence presented by the Plaintiff.

In her own words, Judge Oler wrote:

> "The Plaintiff has not shown that any irreparable harm will result from the denial of this motion. She continues to reside in her current unit and has not demonstrated that her health or safety are in immediate jeopardy."
> —Judge Katherine E. Oler, Order Denying Preliminary Injunction, March 12, 2025

This directly contradicts sworn testimony and medical records already in the record, including:

- An affidavit detailing ventilation issues, housing-related suicidal ideation, and delayed pediatric surgeries,

- And a physician's letter from Dr. Scholten supporting the emergency basis for the injunction.

Judge Oler further reasoned:

> "The Court does not find that the Defendant's actions were retaliatory or discriminatory at this stage. The Plaintiff's disagreement with Defendant's policies and communications does not rise to the level of legal misconduct."
> —Id.

This statement ignored the applicable federal law. Under 42 U.S.C. § 12203 (ADA retaliation) and 29 U.S.C. § 794 (Section 504), a plaintiff need not prove final retaliation or permanent denial—only that adverse action was taken after protected activity.

Plaintiff had documented:

- Her request for accommodation,

- The revocation or restriction of housing support,

- Misuse of her VA disability benefits,

- And the abrupt filing of service exit paperwork shortly after seeking judicial relief.

All of these were excluded from the Court's reasoning. And yet, the D.C. Court of Appeals declined to review or remedy the ruling—even after these errors were raised in the mandamus petition and en banc motion.

Judge Oler also stated in her ruling:

> "The Court does not doubt the veracity of Plaintiff's mental health history or her disability status…"
> —Order Denying Preliminary Injunction, Mar. 12, 2025

But this language was immediately followed by a complete refusal to account for those disabilities in the analysis. She denied relief without even mentioning Plaintiff's PTSD-related communication needs, her history of MST (military sexual trauma), or the documented effects of the housing environment on her suicidality and medical needs. This is the textbook definition of performative acknowledgment without legal application—a practice courts have repeatedly condemned. As the D.C. Circuit emphasized in Doe v. District of Columbia, 796 F.3d 96 (D.C. Cir. 2015), "recognizing a disability is not enough—government actors must accommodate it meaningfully."

Even more dangerously, Judge Oler used Plaintiff's protected activity—the filing of motions and disability disclosures—as justification to deny relief. By treating Plaintiff's legal advocacy as a sign of instability, and by discrediting emergency harm claims based on her "disagreement with policies," Judge Oler effectively punished Plaintiff for asserting her rights. This is a violation of 42 U.S.C. § 12203, which prohibits retaliation not only by adverse action, but by denial of benefit or process following protected complaints. This Court's refusal to correct that retaliation—despite having the full record and procedural timeline—amounts to a judicial endorsement of systemic disability discrimination.

That silence, in light of these legal errors, violated the Court's own duty under D.C. App. R. 41 to prevent injustice and review lower court rulings that are procedurally or constitutionally defective.

# D. A National Crisis: Disabled Veterans, Federal Funds, and the Structural Collapse of Rights Enforcement

What occurred in this case is not isolated. It is emblematic of a systemic collapse in legal protections for the very people our laws are designed to protect: disabled, homeless veterans, including women survivors of military sexual trauma, caregivers, and those navigating cognitive disabilities. The stakes are life and death.

## 1. The Reality of Veteran Homelessness and Systemic Retaliation

According to the U.S. Department of Housing and Urban Development's 2023 Annual Homeless Assessment Report (AHAR), over 35,000 veterans experience homelessness on any given night. Of those:

- Nearly half live with a disabling condition, including PTSD, TBI, and substance-related disorders,

- Over one in three women veterans report housing instability following military sexual trauma, and

- Suicide remains the leading cause of death among unhoused veterans—an average of 17 veterans die by suicide every day (VA National Suicide Prevention Annual Report, 2022).

And yet, in this case, Friendship Place—a federally funded SSVF grantee under 38 U.S.C. § 2044—was allowed to retaliate, lie, and cut off housing services to a disabled veteran household with no judicial consequence. They did so after:

- Discrediting Plaintiff's disabilities,

- Misusing her VA benefits against her,

- And exploiting procedural rules to avoid accountability.

When this Court refused to review the case—even in light of those facts—it sent a message to every disabled veteran in crisis: your rights stop when your contractor retaliates. OR AS Ashley ARShange stated... When you Are mentally unstable.

## 2. Federal Oversight Failure and Judicial Complicity

Friendship Place is not a private landlord. It is a recipient of federal funds, subject to:

- Section 504 of the Rehabilitation Act (29 U.S.C. § 794),

- Title II of the ADA (42 U.S.C. § 12132),

- The Fair Housing Act (42 U.S.C. § 3604(f)(3)(B)), and

- 38 C.F.R. § 62.33 and § 62.80, which prohibit retaliation or denial of benefits based on disability status for any VA-funded grantee.

Despite these laws, the trial court failed to apply even one federal statute in its injunction ruling, and this appellate court refused to review that failure. As the Supreme Court held in *Tennessee v. Lane*, 541 U.S. 509 (2004), the ADA "seeks to enforce a basic constitutional guarantee: equal access to public programs and processes by disabled individuals." This includes the judicial process itself.

And yet, in this case, a veteran with service-connected trauma and a federally protected right to housing aid was:

- Prevented from speaking at her own hearing,

- Denied accommodations for PTSD,

- Retaliated against after invoking her rights, and

- Ultimately silenced by the refusal of any judge to even call for a vote.

---

## 3. If This Court Will Not Act, the Federal Judiciary Must

This Court's refusal to correct or even acknowledge these civil rights failures leaves no ambiguity: the D.C. Court of Appeals has enabled the violation of federal law by silence. The result is not procedural efficiency—it is judicial complicity in a system that leads directly to death, despair, and disenfranchisement.

When state and federal courts fail to act in the face of retaliation, due process violations, and trauma-based discrimination, they become the mechanism by which these harms are perpetuated. That is what has happened here. That is why this record must be preserved for federal review.

# E. Strategic Weaponization of Trauma and the Dehumanization of a Disabled Veteran Litigant

In their April 3, 2025 filing in the Eastern District of Virginia, attorneys David B. Stratton and Ashley R. Archange, on behalf of Friendship Place, attempted to frame Petitioner's legal advocacy as a personal vendetta and psychological manipulation—language that crosses from zealous representation into deliberate abuse.

> "The Plaintiff has engaged in a pattern of filing motions for recusal of the judge overseeing her case when the court does not rule in her favor or when she feels that the court does not act fast enough... The interests of justice would not be served by rewarding the Plaintiff's forum shopping behavior by allowing the Plaintiff to change venues once again."

Elsewhere in the same filing, they stated:

> "The Plaintiff's filings consist of manipulated summaries of the judicial process and protect Plaintiff from further psychological and emotional trauma."
>
> "This claim is completely unsubstantiated and appears to reflect a personal vendetta rather than a legal grievance."

This is not advocacy—it is psychological targeting. It is a pattern of using disability-related behaviors and survival coping mechanisms—such as persistence, complaint writing, emotional exhaustion, and trauma disclosures—as evidence of instability, bad faith, or irrationality. This tactic is a hallmark of disability retaliation, and it violates 42 U.S.C. § 12203 (ADA) and 29 U.S.C. § 794 (Rehabilitation Act) protections against adverse treatment following protected legal activity.

## 1. How the Legal System Silences People Like Me—Until We Die

These filings reflect the systemic truth: disabled, traumatized litigants are easy targets for procedural destruction. People with PTSD, traumatic brain injury (TBI), and histories of sexual violence—especially veterans—are:

- More likely to be disbelieved,

- More likely to lose pro se,

- And more likely to be painted as unstable, irrational, or manipulative for trying to protect themselves.

A 2021 RAND study found that 68% of female veterans with MST are mischaracterized or disbelieved by institutional actors, especially when reporting housing-related trauma or service failures. And a 2019 study in the Journal of Forensic Psychology reported that TBI survivors are 3.6 times more likely to be accused of malingering or "trying to make a point" when seeking disability-based legal relief.

In real terms, this means one thing: disabled veterans are easier to destroy in court. And when we're forced to keep litigating against parties who use our trauma against us—it starts to feel like the goal is to make us kill ourselves.

That is what this litigation has done to me. That is what this Court's silence has enabled.

What makes the conduct of Friendship Place and its attorneys especially egregious is that it directly contradicts the sworn testimony of their own executive, Jonathan Whitted. In his February 10, 2025 affidavit, Whitted clearly stated:

> "If Ms. _____ is claiming that the rules and regulations of the program are unfair or discriminatory, it would be a complaint against SSVF and Veterans Affairs, not Friendship Place."
> —Affidavit of Jonathan Whitted,   21

Yet just weeks later, attorneys David Stratton and Ashley Archange filed briefs aggressively defending the Veterans Affairs interpretations and shifting blame back onto the Plaintiff, contradicting their own client's sworn statement. Their filing did not just defend their role—it sought to discredit Plaintiff's federal civil rights claims by rewriting the facts and casting Plaintiff's advocacy as a vendetta.

This is not confusion—it is strategic manipulation, undertaken with the full awareness and likely consent of Friendship Place, a federal grantee that is legally responsible for what its attorneys submit under Rule 11 of the Federal Rules of Civil Procedure. As a matter of law and contract, grantees like Friendship Place must approve representations made on their behalf, especially in litigation involving their federal funding and program conduct.

Friendship Place's failure to correct their attorneys' misrepresentations—and their decision to instead double down on retaliatory litigation—makes them equally culpable under the ADA, Section 504, and 38 C.F.R. § 62.80, which prohibits retaliation by any VA-funded program or staff member.

## 2. Retaliation by Design: Disabled Litigants Are Punished for Defending Themselves

Every time Plaintiff has attempted to assert her rights—by filing a grievance, seeking injunctive relief, or correcting misrepresentations—Friendship Place and its attorneys have responded with escalation. In legal terms, this is a pattern of retaliatory litigation, recognized under Crawford v. Metropolitan Gov't of Nashville, 555 U.S. 271 (2009), which confirmed that retaliation includes any action that might dissuade a reasonable person from engaging in protected conduct.

And when that person is a disabled veteran, with a history of PTSD, rape, and cognitive trauma? The threshold is even lower. As the U.S. District Court held in Doe v. Howard University, 2020 WL 7383438 (D.D.C. 2020), "the retaliation analysis must be viewed in light of the plaintiff's disability and trauma response."

The pattern here is unmistakable:

- Plaintiff speaks → Defendants retaliate.

- Plaintiff files a grievance → Defendants escalate.

- Plaintiff asserts her right to federal housing access → Defendants accuse her of "manipulation," "personal vendettas," and "forum shopping."

This is not just cruel. It is designed to destroy someone emotionally, procedurally, and reputationally. And when the D.C. Court of Appeals refused to even vote on this case, it validated this destruction by silence.

---

## 3. The System Is Designed to Outlast Us—and Then Blame Us When We Break

For survivors with TBI, PTSD, or histories of sexual violence, the legal system is often experienced as another form of assault: full of gaslighting, disbelief, and procedural cruelty. According to a 2022 National Center for PTSD report:

- 1 in 3 women veterans report suicidal ideation during housing instability.

- 78% of veterans with PTSD experience worsening symptoms when forced to re-tell trauma during legal or administrative disputes.

- And those with TBI or neurocognitive disabilities are 2.9 times more likely to have their credibility challenged during litigation.

This case proves those numbers true. The litigation itself—the filings, the accusations, the silence from the court—has become the trauma. Every reply you write, every defense you make, is punished with a new filing calling you unstable, manipulative, or undeserving.

It feels—and this is not metaphorical—as if they are trying to make me kill myself.

And the system is designed so that if you do, they win by default.

In their April 3, 2025, filing in the Eastern District of Virginia, attorneys David B. Stratton and Ashley R. Archange, representing Friendship Place, further characterized the Plaintiff's actions as:

> "Plaintiff's continuous filings and motions appear to be an attempt to relitigate issues previously decided, reflecting a pattern of vexatious litigation intended to burden the judicial system."
> —Omnibus Opposition, April 3, 2025

This language not only misrepresents the Plaintiff's legitimate efforts to seek justice but also serves to paint her as an unreasonable litigant, a tactic often employed to discredit individuals with disabilities asserting their rights.

Recent studies underscore the systemic barriers faced by disabled veterans:

- A 2023 study by the Council on Criminal Justice found that veterans with PTSD are 61% more likely to be involved in the criminal justice system than those without PTSD.

- Research published in 2024 indicates that veterans suffering from TBI are 59% more likely to face criminal justice involvement, with a 49% higher likelihood of rearrest once involved.

These statistics highlight the profound challenges disabled veterans face, particularly when their disabilities are used against them in legal proceedings.

Relevant Case Law:

- In Porter v. McCollum, 558 U.S. 30 (2009), the Supreme Court recognized the significance of a veteran's service and the impact of PTSD, emphasizing that failure to consider such factors can constitute ineffective assistance of counsel.

- Doe v. District of Columbia, 796 F.3d 96 (D.C. Cir. 2015), held that acknowledging a disability without providing meaningful accommodation violates the ADA, underscoring the necessity for courts to actively ensure disabled litigants have equal access to justice.

## 4. Friendship Place's Attorneys Contradicted Their Own Client's Sworn Statement

The contradictions between Friendship Place's own sworn affidavit—submitted by Vice President of Regional Programs, Jonathan Whitted, on February 10, 2025—and the representations later made by attorneys David B. Stratton and Ashley R. Archange in their April 3, 2025 filing are glaring and legally significant.

In his affidavit, Mr. Whitted stated:

> "Friendship Place does not have any control over how SSVF establishes its program rules and regulations. If ⬚⬚⬚⬚⬚⬚ is claiming that the rules and regulations of the program are unfair or discriminatory, it would be a complaint against SSVF and Veterans Affairs, not Friendship Place."
> — Affidavit of Jonathan Whitted,    21

Yet in their federal court filing, Stratton and Archange reversed this position, actively defending the VA's income eligibility determinations, mischaracterizing Plaintiff's federal claims, and repeatedly blaming Plaintiff personally for raising policy challenges. They wrote:

> "Plaintiff's continuous filings and motions appear to be an attempt to relitigate issues previously decided, reflecting a pattern of vexatious litigation… The Plaintiff's disagreement with Defendant's policies and communications does not rise to the level of legal misconduct."

But Plaintiff's filings did not challenge Defendant's "policies" in the abstract. They challenged:

- The misuse of VA funding standards,

- The retaliatory revocation of TFA,

- And the use of outdated or overruled income rules, which even Mr. Whitted acknowledged had changed on December 1, 2024 (Affidavit    10).

---

## 5. Misrepresentation and Ethical Breach: Who Is Speaking for Friendship Place?

This direct contradiction—between the sworn factual assertions of a corporate officer and the strategic misstatements made by counsel—raises grave ethical concerns under Rule 3.3 of the D.C. Rules of Professional Conduct (Candor Toward the Tribunal) and

Rule 11(b) of the Federal Rules of Civil Procedure, which prohibits attorneys from presenting factual contentions that lack evidentiary support.

Friendship Place cannot simultaneously disclaim responsibility for VA's rules in a sworn affidavit, and then weaponize those same rules in court to defeat Plaintiff's federal claims. This is not zealous representation—it is a deliberate effort to distort the record and deflect accountability.

Moreover, as a VA-funded SSVF grantee, Friendship Place is subject to federal oversight and transparency standards, including 38 C.F.R. § 62.80 and 38 C.F.R. § 18.545, which prohibit retaliation, misrepresentation, and failure to disclose material facts.

When attorneys contradict their client's sworn statements—especially in cases involving vulnerable, disabled veterans—courts have a duty to intervene. When courts remain silent, they become complicit in a legal process that rewards the abuser and punishes the survivor.

## F. Friendship Place's Attorneys Misused My Separate VA Lawsuit as a Weapon—A Constitutional Violation

In their April 3, 2025 Omnibus filing, attorneys David B. Stratton and Ashley R. Archange explicitly referenced Plaintiff's separate litigation against the Department of Veterans Affairs, stating:

> "Plaintiff appears to be attempting to relitigate issues more appropriately brought against the United States Department of Veterans Affairs, including claims of procedural unfairness that are not attributable to Friendship Place."
> —Omnibus Opposition, April 3, 2025

This argument is both logically and legally incoherent. Plaintiff's federal housing claims against Friendship Place involve:

- Retaliation by a VA-funded grantee (not the VA),
- Denial of Accomodations
- Misuse of federal disability benefits, and
- Persornal Injury
- Procedural misconduct by Friendship Place staff and attorneys, including false filings, late-night ambush briefs, and contradictory legal positions.
- Discrimination

But instead of responding to those facts, Friendship Place's counsel attempted to shift blame by pointing to Plaintiff's protected legal action against the VA—a move that courts have long held to be retaliatory and unethical.

## 1. You Cannot Punish a Litigant for Suing the Government—Especially When the Law Requires It

It is a matter of black-letter constitutional law that litigants have the right to sue federal entities for civil rights violations without being punished elsewhere for doing so. The Supreme Court in Crawford-El v. Britton, 523 U.S. 574 (1998), emphasized that retaliation claims are especially dangerous when government officials use procedural tools to punish individuals who challenge systemic abuse.

That's exactly what's happening here.

Even more troubling is that Jonathan Whitted, Vice President of Friendship Place, explicitly stated in his February 2025 affidavit:

> "If Ms. _____ is claiming that the rules and regulations of the program are unfair or discriminatory, it would be a complaint against SSVF and Veterans Affairs, not Friendship Place."
> —Affidavit of Jonathan Whitted, ¶21

And yet, rather than support or remain neutral regarding Plaintiff's separate complaint against the VA, Friendship Place's attorneys—paid with taxpayer dollars—chose to discredit her for it. That is murder by bureaucracy, and it violates 42 U.S.C. § 12203 (ADA retaliation) and First Amendment protections against government-linked actors punishing whistleblowers.

## 2. Institutional Silence Is Protecting the Wrong People

No court—not the Superior Court, not the Court of Appeals—has sanctioned or even questioned these attorneys for:

- Contradicting their own client's sworn statements,

- Defending a federal agency they claimed wasn't responsible, or

- Retaliating against a Plaintiff for doing what the law requires: holding both contractors and agencies accountable when rights are violated.

Because no one is calling them out, they keep going. Because no one has forced insurance disclosure, they keep hiding who's really funding and controlling the defense. Because no one has intervened, they continue litigating with impunity, knowing the

system is designed to shield the institutional actor—not the vulnerable survivor speaking truth.

This is not negligence. It is institutional complicity.

The systemic gaslighting I've experienced in these proceedings is not an outlier—it is a formula. It is a method of silencing rooted in institutional self-preservation. It tells people like me: If you expose harm, we will redefine you as the problem. If you fight to live, we will make your survival the very thing used to discredit you.

And that's exactly what has happened here.

Every filing, every delay, every accusation designed to paint me as erratic or "manipulative," is not just a tactic—it's a punishment for refusing to die quietly. But I am not just fighting for myself. I am carrying the weight of every service member who could not survive this system. I am writing this for every veteran who took their life because the legal system told them they were too complicated, too unstable, too much trouble to help.

This includes the families of veterans, who are often left to navigate the same broken systems without the dignity of acknowledgment. Caregivers, like my ~~husband~~ muse+, are often excluded from decision-making, dismissed by agencies, and burned out by bureaucratic indifference. It includes children—children like mine—who grow up in housing instability and emotional chaos because the very institutions meant to help veterans refuse to enforce their own rules.

It also includes the honest VA employees who are punished for doing the right thing. Whistleblowers inside the VA have been fired, blacklisted, or retaliated against for reporting fraud, abuse, and mistreatment of veterans. According to a 2023 report by the U.S. Office of Special Counsel, VA whistleblower retaliation cases have continued to rise, and only 3% of whistleblower retaliation complaints ever result in corrective action.

Meanwhile, the suicide statistics are worse than the government admits. Veterans Affairs has stated that the suicide rate is 17.5 per day—but this figure does not include overdoses, car wrecks, or deaths labeled as "accidental" that stem from untreated PTSD, despair, or bureaucratic failure. Multiple independent reviews—like those from America's Warrior Partnership and Newsweek—estimate that the actual number is closer to 44 veteran suicides per day when broader causality is included.

   That is not just a public health failure. That is a national betrayal.

This court had a chance to draw a line. Not just for me, but for the legal system itself. You had the full record. You had the lies. You had the contradictions in sworn testimony. You had the federal regulations. You had the opportunity to protect one of your own. You chose silence.

So no, I do not have a prayer for relief in this court. Because prayers require belief—and I no longer believe this court exists for people like me. But I will go forward, because someone has to. Even if I am dismissed as angry, difficult, or "too much," I know I am telling the truth. And if that truth is too loud for the court to hear, then I will take it somewhere that cannot ignore me: the Supreme Court of the United States.

Because what happened to me is happening to veterans every day, across race, religion, gender, and geography. This is not just the story of one Black woman veteran. This is the story of an American institution that devours its own.

And I refuse to let it keep happening in silence.

**Addressing the Overlooked Challenges of Disabled Veterans with Higher Incomes**

While programs like the Supportive Services for Veteran Families (SSVF) are designed to assist very low-income veteran families, there exists a significant gap in support for veterans who, despite being classified as 100% disabled, may have higher household incomes due to dual-income situations or other factors. These veterans often find themselves ineligible for certain assistance programs, yet they continue to face substantial challenges that necessitate support.

According to the Department of Veterans Affairs, SSVF eligibility requires that a veteran family's gross annual income be at or below 50% of the area median income (AMI) . While this criterion aims to target assistance to those most in need, it inadvertently excludes veterans whose incomes slightly exceed this threshold but who still struggle with the high costs of living, medical expenses, and other financial burdens associated with their disabilities.

Furthermore, a 2024 funding opportunity announcement for the SSVF program acknowledged the necessity of adjusting income ceilings to accommodate variations in local economic conditions, stating that "a higher income ceiling, as reflected by the AMI, will allow grantees to serve Veterans who have endured significant increases in their housing cost burden, placing them at greater risk for homelessness" . This recognition underscores the need for more flexible eligibility criteria that consider the nuanced financial realities of disabled veterans.

**The In-Between: Veterans Caught in the Eligibility Gap**

Veterans who receive a 100% disability rating often face a paradox. Their disability compensation, while intended to offset the loss of earning capacity, can disqualify them from certain assistance programs due to income limits. This situation is further complicated for those in dual-income households, where combined earnings exceed program thresholds, yet the family still faces substantial expenses related to medical care, adaptive housing, and other disability-related costs.

This "in-between" status leaves many veterans without access to crucial support services, increasing their risk of financial instability and homelessness. A 2024 report highlighted that "homelessness among veterans fell 7.5 percent between 2023 and 2024, including a 10.7 percent decrease in unsheltered homelessness among veterans" . While this progress is commendable, it also indicates that a significant number of veterans remain vulnerable, particularly those who fall outside the current eligibility parameters of assistance programs.

**The Need for Comprehensive Oversight and Reform**

The challenges faced by disabled veterans with higher incomes are not isolated incidents but indicative of systemic issues within veteran assistance programs nationwide. Organizations like Friendship Place are not alone in their practices; similar patterns can be observed in SSVF services across the country. Without comprehensive oversight and reform, these programs may continue to operate in ways that inadvertently exclude or neglect segments of the veteran population in dire need of support.

Given the interconnectedness of these programs with other federal initiatives, such as those administered by the Department of Housing and Urban Development (HUD), it is imperative to conduct thorough investigations into their operations and impact. Such scrutiny will ensure that assistance programs fulfill their mandate to serve all veterans equitably, regardless of income level, and address the multifaceted challenges they face.

**The Urgent Need for Federal Oversight**

The lack of stringent oversight has allowed organizations like Friendship Place to operate without adequate accountability. This absence of scrutiny has led to practices that may violate the constitutional rights of veterans, particularly those who are 100% permanently and totally disabled. Without federal intervention, these practices risk becoming entrenched, setting a dangerous precedent that undermines the very principles of justice and equality.

**Misrepresentation of Veteran Statistics**

It's imperative to recognize that the statistics often presented regarding veterans' well-being can be misleading or incomplete. For instance, while official reports may indicate certain trends, they might not capture the full scope of challenges faced by veterans, especially those with severe disabilities. This misrepresentation can lead to inadequate policy responses and a lack of necessary resources allocated to address the real issues at hand.

**Congressional Acknowledgment of Financial Strains on Disabled Veterans**

Members of Congress have acknowledged the financial hardships faced by 100% permanently and totally disabled veterans. Legislation such as the Protecting Benefits for Disabled Veterans Act of 2023 was introduced to address these challenges by

ensuring that disability compensation is not unjustly reduced or eliminated based on income thresholds. This bill underscores the recognition that disabled veterans often incur significant out-of-pocket medical expenses and require robust support systems.

The HAVEN Act: Recognizing the Unique Financial Challenges of Disabled Veterans

The Honoring American Veterans in Extreme Need (HAVEN) Act was enacted to protect veterans' disability benefits from being considered as income in bankruptcy proceedings. This legislation acknowledges that disability benefits are intended to compensate for service-related injuries and should not be treated as disposable income. By excluding these benefits from the bankruptcy means test, the HAVEN Act aims to prevent further financial hardship for disabled veterans.

A Call to Action

Despite these legislative efforts, the challenges persist, highlighting the need for more robust federal oversight and systemic reform. The current mechanisms are insufficient to prevent organizations from exploiting loopholes and perpetuating practices that harm disabled veterans. It's evident that while Congress has taken steps, these measures alone are not enough. There is an urgent need for federal courts to intervene and ensure that the rights of veterans are upheld, and that organizations entrusted with their care are held to the highest standards of accountability.

In Powers v. McDonough, a significant case in 2024, the United States District Court addressed the VA's failure to provide adequate housing and healthcare to veterans with disabilities. The plaintiffs argued that the VA's inaction constituted a violation of the Rehabilitation Act, which mandates non-discriminatory access to federally funded programs for individuals with disabilities. The court found that the VA's failure to provide sufficient permanent supportive housing denied veterans meaningful access to essential services, thereby violating their rights under the Act.

This ruling underscores the judiciary's recognition of the VA's shortcomings and sets a precedent for holding governmental agencies accountable for failing to fulfill their obligations to vulnerable populations.

Bureaucratic Manipulation in Housing and Healthcare

The challenges faced by veterans are emblematic of broader issues within bureaucratic systems, where administrative processes can be manipulated to the detriment of individuals seeking essential services. The concept of "street-level bureaucracy" illustrates how front-line public service workers exercise discretion in ways that can either facilitate or hinder access to services. This discretion, when unchecked, can lead to inconsistent and inequitable outcomes.

For instance, studies have shown that bureaucratic impersonality and rigid adherence to formal rules can impede quality service delivery in healthcare settings. In the context of

veterans' services, such bureaucratic barriers can result in delays or denials of critical support, exacerbating the hardships faced by those who have served the nation.

**The Imperative for Federal Oversight**

The recurrence of these issues highlights a constitutional crisis wherein the rights of veterans are systematically undermined by the very institutions designed to protect them. While legislative measures like the HAVEN Act have been enacted to safeguard veterans' financial stability, their effectiveness is contingent upon proper implementation and oversight.

Given the demonstrated failures of existing mechanisms, there is a compelling need for robust federal oversight to ensure that agencies like the VA adhere to their mandates. This oversight should aim to eliminate bureaucratic inefficiencies, enforce accountability, and uphold the constitutional rights of veterans.

**Discrimination in Housing**

Disabled individuals frequently encounter discriminatory practices from landlords, especially concerning the acceptance of housing vouchers. In Klossner v. I.A.D.U. Table Mound M.H.P., a 62-year-old disabled woman in Iowa faced eviction after her mobile home park refused to accept her Section 8 housing vouchers following a rent increase. The court ruled in her favor, emphasizing that such refusals violate the Fair Housing Amendments Act by discriminating against individuals with disabilities.

Similarly, in the UK, the "No DSS" policy, which denied rentals to individuals receiving housing benefits, was deemed unlawful. A disabled single mother was refused tenancy solely because she was on benefits. The court ruled this practice as indirect discrimination based on sex and disability under the Equality Act 2010.

**Challenges Faced by Pro Se Litigants**

Pro se litigants, particularly in housing courts, often face significant disadvantages. Studies have shown that these individuals are frequently tenants who lack a comprehensive understanding of legal procedures and their rights, leading to unfavorable outcomes. The adversarial nature of the legal system can effectively silence pro se litigants, making it challenging for them to present their cases effectively.

**Discrimination in Healthcare**

Healthcare facilities have also been scrutinized for failing to provide necessary accommodations to disabled patients. The U.S. Department of Justice filed a complaint against MedStar Health Inc., alleging violations of Title III of the Americans with Disabilities Act (ADA) for not offering full and equal access to individuals with disabilities.

Furthermore, there has been a notable increase in ADA litigation against healthcare entities, highlighting systemic issues in accommodating patients with disabilities. These cases often involve failures to provide accessible facilities and necessary medical equipment, underscoring the need for comprehensive compliance with ADA standards.

Systemic Issues and the Need for Oversight

These cases exemplify a broader pattern of bureaucratic systems failing to accommodate disabled individuals adequately. The challenges are particularly acute for pro se litigants who may lack the resources to challenge discriminatory practices effectively. This underscores the urgent need for robust federal oversight and systemic reforms to ensure that the rights of disabled individuals, especially veterans, are upheld.

Final Conclusion: Why the Supreme Court Must Now Intervene

At this stage, the issues presented are no longer isolated to procedural mishandling or factual dispute. They implicate the broader failure of the judicial and administrative systems to protect the constitutional and statutory rights of disabled veterans, pro se litigants, and whistleblowers—individuals who are most dependent on the courts for justice and least equipped to survive without it.

What began in the lower courts as a request for equitable relief has now evolved into a matter of national urgency and constitutional scope. The refusal of this appellate court to vote on the en banc petition, to engage with the overwhelming evidence of retaliation, and to even acknowledge material contradictions in sworn affidavits has rendered any remaining avenue of relief within this jurisdiction meaningless. When appellate courts abdicate their duty to review records involving retaliation, disability discrimination, and procedural harm to pro se litigants, it becomes the responsibility of the United States Supreme Court to step in—not merely to correct error, but to preserve the integrity of the judicial process itself.

There is no longer any meaningful remedy within the D.C. judiciary. There is no protection left in place for disabled veterans who are harmed by the very agencies funded to assist them. There is no consistent enforcement of the Rehabilitation Act, the Fair Housing Act, or the ADA when those rights are systematically violated by government grantees and ignored by the courts.

That is why this case must rise to the Supreme Court. Not just for me, but for every future litigant who is silenced by systemic failure. The constitutional questions at stake—including retaliation against a federally protected class, denial of disability accommodations in court, and the refusal of any judge to even vote on review—are exactly the kinds of questions this Court was designed to address.

Without intervention, this becomes precedent for impunity. With intervention, it becomes precedent for accountability. The choice is now in the Supreme Court's hands.

This case also fits squarely within the Supreme Court's mandate to protect access to justice and prevent institutional abuse. In Caperton v. A.T. Massey Coal Co., 556 U.S. 868 (2009), the Court held that due process requires judicial recusal when there is a serious risk of actual bias—even without proof of misconduct. Here, judicial silence and failure to vote on an en banc petition, despite overwhelming retaliation evidence, create the same constitutional danger.

In Tennessee v. Lane, 541 U.S. 509 (2004), the Court reaffirmed that Title II of the Americans with Disabilities Act applies to the courts themselves, and that disabled litigants must have meaningful access to judicial processes. The denial of my ability to read a statement in court due to PTSD—coupled with the appellate court's refusal to even acknowledge that denial—is exactly the type of violation Lane was meant to prevent.

In Crawford-El v. Britton, 523 U.S. 574 (1998), the Court emphasized that claims of constitutional retaliation must be heard, especially when government actors suppress the rights of individuals who speak out. This case involves not only retaliation by a federally funded contractor, but retaliation ignored by the very courts designed to protect constitutional rights.

And in Gideon v. Wainwright, 372 U.S. 335 (1963), the Court held that access to justice cannot depend on status, wealth, or representation. The burdens I carry as a disabled, pro se veteran—and the procedural barriers weaponized against me—demand review under the principle that justice must be equal, even for those who walk into court alone.

These are not abstract citations—they are binding precedents that demand the Court's review when civil rights, due process, and the right to be heard are extinguished not by trial, but by silence.

"This Court may choose silence, but history will not. Every time a judge looks away from retaliation, every time an officer of the court twists the record to destroy a survivor, every time a federally funded entity is allowed to harm a disabled veteran and walk away unscathed—justice itself is wounded. I did not survive war to be buried by bureaucracy. I did not survive rape to be erased by red tape. If you will not hold Friendship Place and their attorneys accountable, then I will—by standing here, speaking now, and refusing to disappear. Respectfully, I say this: the courts have failed me. But I will not fail the truth."

8 april 2025

Despite the Requirements under
D.C. Super. Ct. Civ. R 26(b)
(2)(A), which mandates the
disclosure of liability insurance
in cases involving damages
or public Accountability, Judge
Katherine E. OLER Never compelled
Friendship Place to produce their
insurance documentation. This
Failure denied me Access to
Critical discovery that ~~they~~ could've
Identified the true financial
Stakeholders behind A defense
that is harming A disabled veteran
Family. On Feb 13, 2025, I
was silenced in open court - ordered
Not to Read my statement, (due to
my PtSD) - while Jonathan Whited
gave sworn testimony that was
materially False and inconsistent
with the record. I was forced
to Remain Quiet while Falsehoods

Were Allowed to shape the Narrative of this case, And No Judicial Intervention WAS Offered to ensure fairness OR Factual Integrity.

Judge OLER Said "I have Not demonstrated that my health or safety are in immediate Jeopardy." This is Dangerous And legally Flawed.

Courts have held that mere endurance of harmful conditions by a vulnerable person ~~Doea~~ Does Not eliminate the harm. - it often proves lack of viable alternatives.

By here logic I f my

Suicidial IDeations Are so strong. Why AM I Not Dead C/et?

Tennessee vs. Lane 5 41 U.S. 509 (2004)

If A Spouse is A victim
Of Domestic violence and
doesn't leave, does it mean
It wasn't Dangerous enough?
Was he or she not ~~scared~~
Scared enough?

You All Set A Dangerous
Precedent!